GAI AUDIO OF NEW YORK, INC., ET AL. *v.*
COLUMBIA BROADCASTING SYSTEM,
INC., ET AL.

[No. 521, September Term, 1974.]

*Decided June 26, 1975.*

174

The cause was argued before ORTH, C. J., and POWERS and MOORE, JJ.

*Paul S. Podolak* and *O. John Rogge,* with whom were *Robert B. Barnhouse, Barton Nachamie, A. Michael Fox* and *Arutt, Nachamie & Benjamin* on the brief, for appellants.

*M. King Hill* and *Michael A. Pretl,* with whom were *Smith, Somerville & Case* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This appeal brings before us for the first time, and in the context of a civil action for compensatory and punitive damages, the nationwide phenomenon of "piracy" or "duplication" of musical recordings.[1]

Columbia Broadcasting System, Inc., and Atlantic Recording Corporation, appellees, are the owners of exclusive contracts with popular recording artists and are the manufacturers and distributors of tapes and records on which performances of such artists are recorded. Appellants are four corporations and one individual who, in 1971 and 1972, without appellees' consent, duplicated and sold more than a half-million copies of appellees' tapes at a plant in Elk Mills, Cecil County, Maryland.[2]

---

1. In *State Laws Against Piracy of Sound Recordings: A Handbook for Enforcement and Prosecution,* July, 1974, prepared by the Recording Industry Association of America, the nationwide dimensions of "piracy" are thus described: "It is estimated that the sale of pirated sound recordings on a nationwide level amounts to more than $200 million annually. Most of this total is concentrated in unauthorized duplications of pre-recorded tapes." This volume is more than 10% of the legitimate industry's total retail sales of sound records and amounts to more than one-third of the legitimate industry's annual sales of pre-recorded tapes. According to the Handbook, the earliest criminal statutes were enacted in New York (1967) and California (1968). As of July, 1974, anti-piracy statutes were in effect in 26 States. The constitutionality of the California statute was upheld in Goldstein, et al. v. California, 412 U. S. 546 (1973), *infra.*

2. Maryland Code (1957), 1974 Cumulative Supplement, Art. 27, § 467A, effective July 1, 1973, subsequent to the events involved in this appeal, makes it a criminal offense to transfer recorded sound without consent of the owner of the "master device." The crime is a misdemeanor punishable by a fine up to $2,500 and/or up to one year imprisonment for the first offense and, for any subsequent offense, a fine up to $10,000 and/or imprisonment up to three years.

On May 2, 1972, appellees brought suit in the Circuit Court for Cecil County, alleging unfair competition, conversion and conspiracy, each claiming $300,000 in compensatory and punitive damages against Deeds Music Company, Inc., Deeds Electronic Company, GAI Audio of New York, Inc., Jack Kessler, and ALP Distributing Company. A writ of attachment on original process was issued and certain equipment and other personal property of the appellants, including 58,682 assorted 8-track stereophonic tapes, were seized by the Sheriff of Cecil County on May 3, 1972.

After discovery in this and a related federal proceeding [3] Kesco Textile Company, Inc. ("Kesco"), Playgirl Industries, Inc., Playgirl Fashions, Inc., and Julius Kessler were added as additional parties-defendant by leave of court on February 28, 1973 and July 23, 1973.

The trial before Judge H. Kenneth Mackey, sitting without a jury, began on January 28, 1974 and consumed six (non-consecutive) days. During the course of trial, on February 7, 1974, the defendant, Deeds Music Company, Inc., consented to entry of judgment against it in the amount of $150,000. All claims against the remaining defendants were reserved. The latter offered no testimony and rested at the close of plaintiffs' case.[4]

On March 1, 1974, at the conclusion of the trial, Judge Mackey, in an oral opinion from the bench, entered judgment *nisi* against each of the other defendants under the counts alleging unfair competition and civil conspiracy,[5] in the amounts of $93,701.74 in compensatory and $50,000 in

---

**3.** Jondora Music Publishing Company, et al. v. Deeds Electronic Company, et al., #72-191-M, Civil, U. S. District Court for the District of Maryland.

**4.** Appellants' trial counsel represented to the Court that the U.S. District Court for the Southern District of New York, sitting in Bankruptcy, had ordered the appellees to terminate the litigation and he therefore contended that the appellants could not put on any evidence unless the stay was lifted. This claim was rejected by the trial court on the basis that there was no proper evidence before it of any action by the District Court.

**5.** Appellees did not press below their causes of action based upon conversion.

punitive damages in favor of Columbia Broadcasting System, Inc., and $53,383.25 in compensatory and $25,000 in punitive damages in favor of Atlantic Recording Corporation. Appellees were awarded itemized costs totalling $8,102.99 and were awarded judgment of condemnation absolute against the attached chattels. (A comprehensive supplemental opinion was thereafter filed on May 3, 1974).

From those judgments, made absolute on March 7, 1974, appeals were taken by GAI Audio of New York, Inc., Playgirl Industries, Inc., Playgirl Fashions, Inc., and Julius Kessler.

I

*FACTUAL BACKGROUND*

From the extensive record in this case, the numerous exhibits and the opinion and supplemental opinion of Judge Mackey, the following facts emerge:

Early in 1971, Mr. Jack Kessler, who had engaged in tape duplicating operations elsewhere in the United States,[6] embarked upon a similar enterprise in Maryland. He did so, not alone, but with the extraordinary assistance of his brother, Julius Kessler and an associate of Julius, one Daniel Eisenstein, who were engaged in business in New York's "garment district." The trial court found:

> "In the Spring of 1971 *Daniel Eisenstein*, New York City entrepreneur, formed the Maryland Corporation, Deeds Electronics Co. Inc. He later changed the name of this corporation to Elk Mills Enterprises Inc. About the same time *Jack Kessler* appeared operating a sole proprietorship known as Deeds Electronic Inc. Mr. Kessler rented buildings from the Defendant, Kesco Textile Company Inc., purchased raw material and supplies and leased equipment from G.A.I. Audio of New York Inc., another Defendant, and in the Kesco buildings at

6. Mr. Kessler, we are told, was one of the defendants in a tape piracy case originating in Arizona, Duchess Music v. Stern, 458 F. 2d 1305 (9th Cir. 1972), *infra.*

*Elk Mills, Cecil County, Maryland commenced a tape bootlegging operation wherein he duplicated the tapes of the Plaintiffs, put them in cartridges, packaged them and sold them on the open market. He employed upwards of a score of young ladies, used very sophisticated equipment and turned out these duplicated tapes by the tens of thousands."* (Emphasis added.)

The trial court thus described the role of Julius Kessler:

"Jack Kessler's brother, *Julius,* was, during all times pertinent to this suit, President of G.A.I. Audio of New York Inc., Kesco Textile Company Inc. and Play Girl Fashions Inc., *all of which corporations were subsidiaries of Play Girl Industries Inc. of which he was also President.* Daniel Eisenstein was the Secretary-Treasurer of each of said corporations. Each corporation shared common office space at 225 West 35th Street, New York City. *G.A.I. Audio of New York Inc. had no employees."* (Emphasis added.)

In the fall of 1971, after the U. S. Congress passed Public Law 92-140 amending the copyright law to extend protection to sound recordings and to provide for criminal penalties effective February 15, 1972, Jack Kessler attempted to insulate himself and presumably his associates, from potential federal liability by transferring the duplicating end of the operation to Mr. Leonard Lockhart, a practicing lawyer in Elkton.

Mr. Lockhart had been providing legal advice to Jack Kessler, specifically with regard to the compulsory licensing provisions of the Copyright Act, 17 U.S.C. § 1 (e).[7] Mr.

---

7. As explained infra, this provision allows one to make a "similar use" of copyrighted songs upon the payment of 2 cents a copy royalty despite the fact that the composer licensed only one manufacturer to produce the musical composition. It was enacted in 1909 to avoid monopolies in the production of perforated piano rolls while still granting the composer some protection. For a discussion of the statutory provision and the meaning of the phrase "similar use of the copyrighted work" *see* Jondora Music Publishing Company, et al. v. Melody Recordings, Inc., et al., 506 F. 2d 392 (3rd Circuit filed Dec. 27, 1974), *infra.*

Lockhart was of the opinion that so long as appellants paid 2 cents a copy to the original composer of the music they could duplicate records and tapes of major companies with impunity. The trial judge, in his Supplemental Opinion found that Daniel Eisenstein told Lockhart that Jack Kessler "had certain troubles with the Internal Revenue Service and felt that he would like to get out of the tape duplicating operation." The court expressed doubt that the attorney was aware of the pendency of Public Law 92-140.

The transfer was accomplished first by Mr. Lockhart's formation of a Delaware corporation, Deeds Music Company, Inc. (Deeds), with himself as president and sole stockholder. Then, on November 11, 1971, Mr. Lockhart went to a meeting at 225 W. 35th Street, New York City, with Jack Kessler and his brother, Julius Kessler, Barton Nachamie, an attorney, and Daniel Eisenstein.

With respect to the agenda of the New York meeting, the trial court found:

> "When Leonard [Lockhart] arrived in New York Mr. Nachamie, on behalf of the other participants, already had several papers prepared. These consisted of a lease of the real estate 'for the purpose of manufacturing and recording tapes and similar devices electronically.' *In this lease Deeds rented from Kesco* for a period from November 15, 1971 to March 14, 1972 *at an annual rental of $18,000.* This was signed by Julius Kessler, President of Kesco, and Leonard Lockhart, President of Deeds Music Company, Inc. The tenant had an option to renew the lease for three (3) years at an annual rental of $24,000. Mr. Nachamie also had prepared *a lease of the equipment from GAI Audio of New York, Inc. to Deeds Music Company, Inc.* signed by Julius Kessler, President of GAI, and Leonard H. Lockhart, President of Deeds. *The rental was $1,000 per week, total rent $191,000.00, effective November 15, 1971.* An inventory of the equipment is attached to the lease. The list commenced with one Ampex duplicator and the

second item is 5 Ampex slaves. Another agreement of the same date between GAI and Deeds signed by Julius Kessler, President of GAI, and Leonard H. Lockhart, President of Deeds *called for GAI to provide raw materials on consignment* to Deeds to be paid for within 30 days. These were proven to be the raw materials necessary to operate the duplicating process and to package the finished tapes. Four (4) days later when Leonard was back in Elkton he agreed with Jack Kessler — an agreement that had been discussed in New York with the other parties — *that Deeds Music Company, Inc. would buy from Deeds Electronics Company, an individual proprietorship owned by Jack Kessler, the business for the sum of $5,000.* This agreement of sale refers to a 'Memorandum of Understanding Between GAI Audio of New York, Inc., Jack Kessler and Deeds Music Company, Inc. signed November 11, 1971.' This agreement was signed by Jack Kessler, individually, and Leonard H. Lockhart as President of Deeds Music Company, Inc." (Emphasis added.)

Thereafter, Jack Kessler continued to live within 300 yards of the duplicating plant at Elk Mills and, in addition, as head of a newly established "ALP Distributing Company," he occupied business space in a separate room adjacent to the terminus of Lockhart's production line. Jack Kessler, as ALP, distributed all of the tapes copied by Deeds. He was, in fact, Deeds' only customer and paid Deeds $1.15 per tape. The tapes were resold for about $3.00 retail.[8]

Selected for duplication were the most popular and best selling tapes of the appellees. Mr. Lockhart, called as an adverse witness by the appellees, testified in this connection:

"You see, Atlantic and Columbia have a great gimmick in what they do. They put two good songs

---

8. Jack Kessler was also known as Jack Fine. He was residing in Los Angeles at the time of trial. The sheriff's return in this case was *non est* as to Jack Kessler and ALP Distributing Company.

on and six bad ones and they will sell it for $6.95. Now, very honestly, what we did was we put eight good ones on and they were sold to the market for $3.00. So that it was a value to the kids around the country and its serves a purpose, in my mind. I do not want to argue the case with you, but I want to disagree when you say that we took theirs and we made one master. That is not so. Instead of giving you one good one and six bums that you have to ride down the road and hear, we would take one from one and one from another as that catalog will indicate."

During the relatively short period of its existence, from November 15, 1971 until March 31, 1972, Deeds Music Company under Leonard Lockhart had gross income of approximately $496,000 but nevertheless operated at a loss of approximately $38,000. True to his own commitment, Lockhart paid royalties to publishers in the sum of $95,578.65 but checks aggregating $53,000 remained uncashed.

A veritable mass of invoices relating to equipment, raw materials and supplies used by Deeds Music Company in its duplicating operations, were received in evidence. A large number of these invoices were from appellant, GAI Audio of New York, Inc. As previously noted, that company had no employees. Somewhat mysteriously, its invoices to Deeds Music contained only the name of a company with which GAI had placed an order, the amount of the charge, *plus* 5%. The trial court found that no details of these invoices were ever given by GAI nor requested by Lockhart.

In addition, thousands of dollars of invoices for materials and supplies sold by such suppliers as Ampex, Data Packaging Corporation, Elpan Marketing Co., Weldotron, Harvey Radio, Minnesota Mining and Manufacturing and Joganburg were made not to Deeds Music, nor to GAI Audio but to Playgirl Industries, Inc., and to one of its wholly-owned subsidiaries, Playgirl Fashions, Inc., a company engaged in the manufacture of ladies' dresses. Julius Kessler was president of both companies and his

name appears on numerous invoices as the person placing the order.

The inevitable denouement came in March, 1972. It did not result, as might be anticipated, from Deeds' financial collapse. On or about March 31, 1972, certain music publishers initiated a copyright infringement suit in the United States District Court, District of Maryland, against Deeds Music Company, Inc., and Leonard H. Lockhart, individually. *Jondora Music Publishing Company, et al. v. Deeds Electronic Company, et al., supra,* n. 3. This resulted in a consent decree whereby Lockhart and Deeds Music agreed to discontinue the duplicating operations at Elk Mills.[9]

On this appeal, the brief of appellants contains "many scatter-gun arguments," as appellees' brief aptly suggests. We treat them in the following order.

## II

### TRIAL COURT RULINGS

Appellants' argument entitled "The rulings of the trial court irreparably prejudiced appellants, depriving them of due process of law" contains the following "discussion:"

> "We refer to all the questions appearing under item #5 of the Questions Presented on page 2 of this brief, on the record of the case sent up to this Appellate Court *without further ado.* The limitation to 25 pages of brief under Rule 1031 (b) of the Rules of this Court prevents *further* argument." (Emphasis added.)

The rulings of the trial court thus sought to be challenged are the following: [10]

---

9. Mr. Lockhart, in his testimony, presents the spectacle of the proverbial "sad but wiser" man. The venture, he stated, was "no fun for Leonard Lockhart." He added that it "almost ruined" himself and his family and that he incurred a loss of approximately $40,000. There was evidence below that Jack Kessler's company, Deeds Electronic, was still actively dealing with some of the other defendants after November 15, 1971, even though Lockhart had acquired the exclusive right to use the factory.

10. These are as stated at page 2 of appellants' brief.

"i. Failure to quash and dissolve attachment,

ii. Granting amendment to declaration to bring in previously known new parties, including Julius Kessler, Playgirl Fashions, Inc., February 27, 1973,

iii. Failure to declare a mistrial upon the confession of judgment of alleged conspirator Deeds Music Co., Inc., February 7, 1974,

iv. Allowing appellees to introduce into evidence, but not placing into the record, matters taken in camera, and on which appellants were denied due process of law in denial of right of confrontation and cross-examination on matters taken into consideration by the trial court determining the issues and

v. Violation of substantial rights of appellants by permitting improper testimony to be admitted, consisting of opinions on ultimate facts properly and exclusively the province of the trier of the facts, upon unsupported-by-record conclusions of fact by witnesses, opinions by non-experts, failure to reject hearsay evidence, and evidence the result of patent improper leading by counsel, and the result of rulings and failure to rule upon objections taken in the record.

vi. Failure to credit appellants with the value of tapes, machinery and equipment, lost rentals and damages caused to appellants by seizure of properties of appellants, as well as by failure to safeguard same against a subsequent theft thereof."

We first observe that Rule 1031 has, since July 1, 1973, imposed a 35, *not* 25, page limitation on briefs before this Court. Moreover, this rule expressly recognizes that the page limitation may be exceeded by "special permission of this Court."

Secondly, subsection c 4 of Rule 1031 provides: "The brief

of the appellant *shall* contain (emphasis added): 'Argument in support of the position of the appellant.' " This rule has been clearly violated. We do not consider any of the points above listed because there is no argument in support of them and they are, in effect, waived. As Judge Davidson said very recently for this Court in *Kimbrough v. Giant Foods, Inc.*, 26 Md. App. 640:

> "Maryland Rule 1031 c 4 provides that the brief of an appellant to this Court shall contain argument in support of his position. The Court of Appeals has held that issues, even of constitutional dimension, can be waived for failure to comply with the procedural requirements to preserve the right to appellate review. Under the present circumstances the constitutional issue is not properly before this Court and will not be considered." [11]

Furthermore, with respect to appellants' question v. above, we would reiterate what was said by the Court of Appeals in *Clarke v. State*, 238 Md. 11, 207 A. 2d 456 (1965). "[W]e cannot be expected to delve through the record extract to unearth motions or contentions that are not named and argued in the brief." *See also, State Roads Commission v. Halle*, 228 Md. 24, 32, 178 A. 2d 319 (1962).

## III

### FEDERAL COPYRIGHT LAW

As previously noted, the federal copyright laws were amended in 1971, so as to afford protection to sound recordings for the first time. Act of October 15, 1971, Pub. L. 92-140, 85 Stat. 391, 17 U.S.C. §§ 1 (f) and 101 (e). The statute was made specifically applicable "only to sound recordings fixed, published and copyrighted" on or after February 15, 1972 and before January 1, 1975. The amendment was not to have retroactive effect.

---

11. Had these points been properly presented for our review, we would have held them to be without merit.

Appellants argue that their duplicating enterprise, since it occurred prior to February 15, 1972, was entirely legal, protected by the compulsory licensing provisions of the copyright law, 17 U.S.C. § 1 (e), adopted in 1909, which reads: [12]

> ". . . And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; . . ."

The effect of the law, therefore, was that the composer had the right to select the licensee who would originally produce a record of the musical work but, thereafter, any other manufacturer could record upon 3 conditions:

(a) Payment of royalties of 2 cents per record or tape.

(b) Filing a notice of intent to use; and

(c) Making a "similar use of the copyrighted work."

Appellants' claim of "similar use" is an apparent misapplication of the compulsory licensing section of the federal copyright law. It confuses the copyright interest of the *composer* with the interest of the recording company licensee authorized to reproduce, by recording the composer's musical creation. *Marks Music Corp. v. Colorado Magnetics, Inc.*, 497 F. 2d 285, 290 (10th Cir. 1974).

In *Marks*, as in the principal cases in other appellate circuits wherein the question of "similar use" has been interpreted, *see Duchess Music Corporation v. Stern*, 458 F.

---

12. The copyright protection for sound recordings afforded by Public L. 92-140 (1971), *supra*, does not include a provision for compulsory licensing.

2d 1305 (9th Cir. 1972), *cert. denied*, 409 U. S. 847 (1972); *Jondora Music Publishing Company v. Melody Recordings, Inc.*, 506 F. 2d 392 (3d Cir. 1974), the publisher — not the third-party recorder — was seeking relief under the copyright law. In *Marks*, Circuit Judge McWilliams made the following cogent observation concerning the application and effect of the compulsory licensing provisions:

> " . . . This means, to us, that one who complies with royalty payment called for by the statute, though not having any authorization from the copyright owner, may nonetheless then 'use,' *not a third party's record*, but the copyrighted composition, which has been characterized as the 'raw material,' in a manner 'similar' to that employed by the recording company which did have authorization from the copyright owner. There is, of course, nothing in the statute which affirmatively authorizes Magnetics to duplicate and copy the recording of one licensed by the copyright owner to reproduce his composition. However, under the statute Magnetics may 'use' the copyrighted composition in a manner 'similar' to that made by the licensed recording company. All of which means, to us, that Magnetics may make its own arrangements, hire its own musicians and artists, and then record. *It does not mean that Magnetics may use the composer's copyrighted work by duplicating and copying the record of a licensed recording company.* Such, in our view, is not a *similar* use." (Emphasis added.)

Indeed, this was the interpretation of "similar use" and the basis for its application in the very first case to construe the language of the amendment of 1909, *Aeolian Co. v. Royal Music Roll Co.*, 196 F. 926 (W.D. N.Y. 1912), where the District Court said:

> ". . . but the subsequent user does not thereby secure the right to copy the perforated rolls or records. He cannot avail himself of the skill and

labor of the original manufacturer of the perforated roll or record by copying or duplicating the same, but must resort to the copyrighted composition or sheet music, and not pirate the work of a competitor who has made an original perforated roll." 196 F. at 927.

In *Jondora*, supra, the Third Circuit expressed agreement with the interpretation above quoted from *Aeolian* as well as with the quoted language from *Marks* but felt impelled to state further in the majority opinion:

"We agree with this interpretation of the statute but feel even more strongly that the duplicators or pirates do not 'use' the composer's work in a 'similar' fashion — *indeed, they do not utilize the composer's work at all. It is a recording which is used.* Rather than permit the use of a recording of the composition, the statute only authorizes the use of the copyrighted work, that is, the written score." (Emphasis added.)

It is plain, therefore, that the majority opinions of the federal circuit courts which have considered the issue of "similar use" under the federal copyright law, reject the interpretations argued by appellants in this case.[13] This, however, is not dispositive of the central issue before us, whether the common law right to protection against unfair competition is violated when the music production (tape or

---

**13.** Appellants at oral argument placed heavy reliance upon three District Court decisions, authored by U. S. District Judge Frederick B. Lacey, Jondora Music Publishing Co. v. Melody, 351 F. Supp. 572 (D. N.J. 1972); 362 F. Supp. 488 and 362 F. Supp. 494 (D. N.J. 1973). Judge Lacey had held that the Aeolian and Duchess Music Corp. cases, *supra*, had been incorrectly decided. The Circuit Court of Appeals, Third Circuit, reversed the judgment reported at 362 F. Supp. 494 in Jondora Music Pub. Co. v. Melody, 506 F. 2d 392 (1974), *supra*, Weis, J., with a dissenting opinion by Gibbons, J. At oral argument in this case, counsel for appellees informed the court that a decision of the Third Circuit Court of Appeals reversing Judge Lacey had just been filed. Copies of the opinion were subsequently transmitted. Counsel for appellants, Mr. Rogge, in a communication to the Court concerning the decision, stated: "To District Judge Lacey's able opinions [supra], ... we can now add the perceptive dissent of Judge Gibbons. It is submitted that Judge Gibbons had the better part of the argument."

record) of a recording company is duplicated and sold in the open market, with the label of the duplicator. The reason why the status of the appellants' conduct under the federal copyright law is not dispositive of that issue is to be found in the decision of the United States Supreme Court in *Goldstein v. California,* 412 U. S. 546 (1973).

The petitioners in *Goldstein* were convicted under a California penal statute involving record piracy. They argued that the federal copyright law preempted the field, thus invalidating the State law. In an opinion by Mr. Chief Justice Burger, dealing only with recordings "fixed" before February 15, 1972, the majority of the Court held that the Constitution neither implicitly precludes States from granting copyrights nor grants such authority exclusively to the federal government. Affirming the convictions, the Court concluded that California, in enacting the law against tape piracy, had exercised a power it retained under the Constitution and that the statute did not intrude into an area which Congress had preempted.

We concur with the holding of the Supreme Court of Wisconsin in *Mercury Record Productions, Inc. v. Economic Consultants, Inc.,* 218 N.W.2d 705 (1974), that *Goldstein* permits State protection against record piracy by common law as well as by statute. As the Court there stated (p. 712):

> "Under the standards of *Goldstein,* state law may be applied. We see no indication that the United States Supreme Court put its imprimatur on statutory law, but not upon the power of a common-law court acting in accordance with the accepted public policy of its state. The same conclusion was reached in Jondora Music Publishing Co. v. Melody Recordings, Inc. (D.C.D.N.J., 1973), 362 F.Supp. 494, 497; Note, Copyrights: States Allowed to Protect Works Not Copyrightable Under Federal Law, 58 Minn.Law Rev. 316, 324 (1973); and Note, 8 Univ. of San Francisco Law Rev., *supra,* 199, 211."

*See also Capitol Records, Inc. v. Mercury Records*

*Corporation*, 221 F. 2d 657, 662 (2d Cir. 1955); *Tape Head Company v. R.C.A. Corporation*, 452 F. 2d 816 (10th Cir. 1971).

Accordingly we now consider the merits of this appeal in the light of common law principles concerning unfair competition.

## IV

### *UNFAIR COMPETITION AND CONSPIRACY*

No issue of fact arises as to the nature of the business conducted in 1971 and 1972 at Elk Mills, Maryland by Deeds Music Company, Inc. and its predecessor Deeds Electronic Company. Indeed, it is plain from the record in this case, including the answers to interrogatories read into evidence, that everyone connected with the enterprise in Cecil County knew precisely that its purpose was "to produce pre-recorded tapes."

Nor is there any contradiction of appellees' testimony concerning the identity of the performers with whom they had entered into exclusive contracts, nor the cost of producing the recordings which have been duplicated by the appellees. The record shows, for example, that the cost ranges from $15,000 up to hundreds of thousands of dollars per record or tape; that advances to certain artists might be made in the hundreds of thousands of dollars and that the recording companies are obligated to pay royalties not only to the artists themselves but to (a) music publishers, (b) the American Federation of Musicians and (c) the American Federation of Television and Radio Artists. In return, of course, the recording organization receives not only the exclusive services of the artists but also the ownership of the "Master" for an unlimited period of time.[14] In addition to the costs of making the recordings and the royalties involved, appellees also expend substantial sums of money in

---

**14.** Among the artists with whom the appellants here had exclusive agreements were Johnny Cash, Simon & Garfunkel, Lynn Renee Anderson, Tammy Wynette, Marty Robins, Ray Price, The Rolling Stones, Aretha Franklin, Beth Middler and Roberta Flack.

packaging and in sales promotion through the recognized advertising media.

Appellants, by merely copying the final product, thus producing tapes at a nominal cost, were relieved of all of the burdens incurred by appellees in producing the original recordings. Furthermore, appellants shared none of the risk, inherent in the music recording industry, since they would record only the star performers and "hit" songs, taking advantage of a market which appellees had created.

Protesting innocence of any wrongdoing, however, appellants argue that there was no passing off as their own in their operations — that the labels of Deeds Music Company were affixed to every tape and package. Whatever vitality this defense may have afforded prior to the celebrated decision of the United States Supreme Court in *International News Service v. Associated Press*, 248 U. S. 215 (1918), that case clearly eliminated "passing off" as a required element of a cause of action for unfair competition.[15] There, the Associated Press sought an injunction against its competitor, the International News Service (INS) from appropriating news gathered from around the world, using such techniques as copying from the early editions of Associated Press papers and disseminating it as INS news to INS subscribing newspapers, copying the news releases from the bulletin boards of Associated Press and otherwise obtaining Associated Press news submitted to east coast newspapers and sending it by telegraph or telephone to offices of INS on the west coast. The Court, in an opinion by Mr. Justice Pitney, held that these facts stated a proper case for unfair competition irrespective of whether or not there was a general and absolute property right in the news as such.

The majority of the Court thus established "misappropriation" as a new concept of unfair competition — em-

---

15. Prior to INS v. Associated Press, the three elements of a cause of action for unfair competition were: (a) appropriation of plaintiff's production; (b) competition between plaintiff and defendant and (c) "passing off", meaning to represent by the defendant that the plaintiff's product was the defendant's. *See*, Mercury Record Productions, Inc. v. Economic Consultants, Inc., 218 N.W.2d 705, 709 (Wis. 1974), *supra*.

phasizing the competitive relationship and stressing the reciprocal rights and duties arising from it. *See*, 2 Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* (3d ed. 1968), § 60.3, p. 508. The constituent elements of the "misappropriation" cause of action postulated in the INS case are (1) time, labor, and money spent in the creation of the thing misappropriated, (2) a competitive relationship between plaintiff and defendant and (3) commercial damage to the plaintiff. The Court stated that "the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. . . . It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition." (p. 236).

The Court then referred to the activities of the International News Service in terms strikingly apposite to the instant case (p. 239):

> "In doing this defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, *and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown.* Stripped of all disguises, *the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped,* in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself, and a court of equity ought not to hesitate long in

characterizing it as unfair competition in business." (Emphasis added.)

It is clear that appellants here appropriated the product of the appellees "precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not."

In Maryland the concept of unfair competition enunciated by Mr. Justice Pitney in the International News Service case has not yet been applied but was cited by Judge Delaplaine speaking for the Court of Appeals in the case of *Edmondson Village Theatre, Inc. v. Einbinder*, 208 Md. 38, 116 A. 2d 377 (1955). He wrote:

"Like most doctrines of the common law, the law of unfair competition is an outgrowth of human experience. The rules relating to liability for harm caused by unfair trade practices developed from the established principles in the law of torts. These rules developed largely from the rule which imposes liability upon one who diverts custom from another to himself by fraudulent misrepresentation that the goods he is offering are the goods produced by the other. In England this type of fraud is commonly called 'passing off' or 'palming off' one's goods as those of another.

\* \* \*

"While the original basis of equitable relief was the fraudulent deception of the purchaser, the United States Supreme Court, in the opinion delivered by Justice Pitney in 1918 in *International News Service v. Associated Press*, 248 U. S. 215, 39 S. Ct. 68, 71, 63 L. Ed. 211, 2 A.L.R. 293, held that 'the right to acquire property by honest labor or the conduct of a lawful business' is as much entitled to protection as the right to guard property already acquired, and that it is this right that furnishes the basis of the jurisdiction in the case of unfair competition.

"The essential element of unfair competition is deception, by means of which the goods of one dealer are passed off as the goods of another, and the seller receives the profit which he would not have received except for such deception."

The principle that unfair competition is no longer limited to misrepresentation by the wrongdoer in using the name of another to palm off his own product and that it now embraces other schemes in which the wrongdoer uses his own name by misappropriating the property of another, is clearly recognized in other jurisdictions.

In its application of the misappropriation theory in *Mercury Record Productions, Inc. v. Economic Consultants, Inc.*, 218 N.W.2d 705, 709 (Wis. 1974), *supra*, the Supreme Court of Wisconsin found the thread of this theory in a 1916 Wisconsin case, *J. I. Case Plow Workers v. J. I. Case Threshing Machine Company*, 155 N. W. 128, 134, an action for unfair competition, where the Court said:

"The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown nor gather where another has strewn."

Again, in a suit by the National Broadcasting Company for an injunction based upon unfair competition and for an accounting and damages based upon tape piracy, *National Broadcasting Company, Inc. and Columbia Broadcasting System, Inc. v. Nance,* 506 S.W.2d 483 (1974), the Missouri Court of Appeals stated:

"In principle, the present defendants' misappropriation is worse than that in *International News* and *National Directory*. Here defendants are trebly appropriating plaintiffs' property rights: (1) the musical performances plaintiffs have produced and advertised, (2) the names of the artists whose performances plaintiffs had the exclusive right to use and (3) the album titles plaintiffs have created and advertised. *Thus defendants*

*have put a new cover on copies of plaintiffs' products and sold it as their own.* As we said in affirming the trial court's injunctive relief in *National Directory:* 'A more flagrant case of unfair competition is nowhere disclosed by the books. In fact, the scheme is more than unfair competition; it amounts to an actual appropriation of the plaintiff's property by the defendants to their own business purposes. A court of equity ought not to hesitate long to interpose its protection against a scheme of this character.' " (Emphasis added.)

In reversing and remanding with instructions for the issuance of a permanent injunction against the defendants and for an adjudication of plaintiffs' claims for accounting and damages the Court in the *Nance* case pointed out that the "growing practice of 'tape piracy' " by re-recording original phonographic tapes has been enjoined in at least five states, citing *Capitol Records, Inc. v. Spies,* 130 Ill.App.2d 429, 264 N.E.2d 874 (1970); *Capitol Records, Inc. v. Erickson,* 2 Cal.App.3d 526, 82 Cal. Rptr. 798 (1969); *Liberty/UA, Inc. v. Eastern Tape Corporation,* 11 N.C.App. 20, 180 S.E.2d 414 (1971); *Columbia Broadcasting System v. Custom Recording Company, et al.,* 258 S. C. 465, 189 S.E.2d 305 (1972); *Capitol Records, Inc. v. Greatest Records, Inc.,* 43 Misc. 2d 878, 252 N.Y.S.2d 553 (N.Y.Sup.Ct.1964).

The record in this case amply supports the findings of the trial court that the appellees below had established the appellants' liability on grounds of unfair competition.

With respect to the appellees' cause of action based upon alleged conspiracy, the principles of civil conspiracy under which the appealing defendants, GAI Audio Company, Playgirl Industries, Inc., Playgirl Fashions, Inc. and Julius Kessler were held liable are well established in the common law and the Maryland cases. It is necessary to show only that a defendant had knowledge of an illegal enterprise and that he performed one or more "overt acts" in furtherance thereof. *See Green v. Washington Suburban Sanitary Commission, et al.,* 259 Md. 206, 269 A. 2d 815 (1970); *Van Royen v. Lacey,* 262 Md. 94, 277 A. 2d 13 (1971); *Daugherty*

*v. Kessler,* 264 Md. 281, 286 A. 2d 95 (1972). As Chief Judge Hammond stated in *Kessler, supra,* 292:

"In a civil case not involving a criminal act, conspiracy may be shown by a preponderance of the evidence and may be proved by circumstantial evidence since almost never is direct evidence available. Conspiracy may be shown by inferences drawn from the nature of the acts complained of, the individual and collective interests of the alleged conspirators, the situation and relation of the parties, their motives and all the surrounding circumstances preceding and attending the culmination of the common design."

The knowledge of each of the appellants of the nature of the enterprise at Elk Mills is beyond doubt and the record also establishes that each of the appellants contributed substantially to the illegal activity. GAI Audio Company had, of course, the most direct involvement, having leased all of the recording equipment to Deeds Music Company, Inc., and having entered into a contract with it for providing supplies and raw materials. Mr. Julius Kessler, along with his brother Jack and Mr. Eisenstein, could clearly have been found by the trial court to have been a principal mover behind the scenes in establishing and conducting the tape operation; and, as the financial records indicate, he received a salary from GAI for his efforts. As Judge Mackey noted in his Supplemental Opinion "his individual hand is apparent in the activities of the respective corporations with which he was affiliated." The Court further found:

"GAI Audio of New York, Inc., the principal actor aside from Deeds Music Company, Inc., had no employees and the Court finds as a fact that it was nothing more than a shell front for the individual activities of Julius Kessler in the bootlegging scheme. Julius is further implicated by the unexplained random interchangeability of corporate names (GAI, Deeds, Playgirl Fashions, Playgirl Industries, Kesco) for ordering, billing, shipping

and paying for the bootleg activities. Only Julius
and Daniel Eisenstein held stock in any of these
corporations except Deeds. Julius Kessler is also
implicated by 'J. Kessler' placing Deeds orders
for cartridge tapes using the name 'Playgirl
Industries' and the address 'Elk Mills, Md.' It is
fairly inferred and thus found as a fact by the
Court that 'J. Kessler' was Julius Kessler. If it were
Jack Kessler the defense could have but did not
explain it."

The remaining appellants, the two Playgirl companies of
which Mr. Julius Kessler was president, played a less direct
role in the conspiracy but still a most substantial one
providing, as they did, the financial base upon which the
duplicating activity was supported.

Finally, our appellate function is not, as appellants
suggest in their brief, to determine whether or not a *prima
facie* case was established against any of the appellants. The
case was tried below without a jury and we review the case
upon the law and the evidence but the judgment of the lower
court will not be set aside on the evidence unless "clearly
erroneous." Maryland Rule 1086. The Rule also provides that
"due regard will be given to the opportunity of the lower
court to judge the credibility of the witnesses." We could not
say that the court was clearly erroneous.

## V

### COMPENSATORY AND PUNITIVE DAMAGES

The remedies generally available to a plaintiff who has
established unfair competition include injunctive relief,
compensatory damages and punitive damages. With
reference to the types of relief which may be prayed, the law
is thus stated in 74 Am.Jur.2d, Trademarks and Trade-
names, § 145:

"In cases involving unfair competition the rem-
edies available to an injured party include *an
injunction* against further use of the offending

article or package, the award of *actual damages including special proof damages and loss of profits*, the imposition of *punitive damages*, the ordering of an *accounting* to the injured party by the offending party *for all profits* arising out of the imitation, and the *destruction of the simulated object* still in the offending party's possession or control. (Italics supplied.)

*See also Coca-Cola v. Dixi-Cola Laboratories, Inc.*, 155 F. 2d 59 (4th Cir. 1946); *Car-Freshner Corporation v. Marlenn Products Company, Inc.*, 183 F. Supp. 20, 46 (D. Md. 1960).[16]

In the instant appeal the appellees did not seek injunctive relief but did pray for and were awarded by the lower court both compensatory and punitive damages as follows:

|  | Compensatory | Punitive |
|---|---|---|
| Columbia Broadcasting System | $93,701.74 | $50,000 |
| Atlantic Recording Corp. | 53,383.25 | 25,000 |

*Compensatory Damages*

In attempting to challenge the trial court's award of compensatory damages, appellants contend that appellees failed or refused to "substantiate their claimed loss of profits with figures properly attributable, although power to reveal alleged 'trade secrets' was within their grasp. That approximate compensatory damages can be estimated does not support the verdict, when it was possible to submit actual figures [sic]." The difficulty of ascertaining the actual thrust of this vague argument is compounded by the lack of any further discussion of the point.

---

16. In Car-Freshner, Judge R. Dorsey Watkins enjoined the defendant from "further acts of unfair competition," required it to account and pay over "all gains or profits derived from its unfair competition;" to pay the plaintiff all damages sustained and costs. A demand for treble damages and attorneys' fees was denied, in the absence of a statutory provision because "such a recovery would constitute an assessment in the nature of exemplary or punitive damages, which this court, functioning as a court of equity, has no power to award."

The reference to "trade secrets" appears to refer to testimony taken in chambers at the request of the appellees who opposed, on trade secret grounds, public disclosure of figures relating to royalties paid to performing artists, total income for appellees, cost data and related factors. We think the taking of *in camera* testimony was a proper exercise of the court's discretion, particularly when the *in camera* disclosures were made to the court in the presence of counsel for the appellants with full right of cross-examination. *Space Aero Products Company, Inc. v. R. E. Darling Company, Inc.*, 238 Md. 93, 208 A. 2d 74 (1965); *See also* Annot. "Safeguarding Trade Secrets," 62 A.L.R.2d 509 (1958).

With regard to appellants' second contention relating to "actual figures," we can only assume that they are referring to the differences in the methods used in calculating damages by the two appellees. Specifically, it appears that appellants are complaining because one of the appellees, namely, Columbia, used *average* figures in determining its costs of production instead of using the *actual* cost figures, as Atlantic did.

In order to determine the amount of lost profits due to appellants' duplication of their tapes, both Columbia and Atlantic first determined their lost revenue—the amount which they would have received if they had sold the tapes which Deeds sold.[17] Columbia did this by simply using its net selling price for a pre-recorded tape and thus calculating its revenue on a "per tape" or "per unit" basis (*e.g.*, a "Columbia" label tape listing for $6.98 retail would have a net selling price or lost revenue per tape of $3.58). Atlantic, on the other hand, calculated its *total* lost revenue by multiplying its net selling price per tape by the number of

---

17. The Columbia case with respect to damages was developed by the testimony of Gary Mankoff, Director of Finance, Planning and Analysis and by a number of exhibits. Melvyn R. LeWinter, Comptroller of Atlantic Recording Company, testified for Atlantic. Their combined testimony represents a substantial portion of the extensive transcript in this case. We are impressed with the considerable amount of detail and analysis on the subject of damages presented in the testimony and exhibits of both appellees.

tapes sold by Deeds,[18] thus yielding a figure for total revenue lost for *all* Atlantic tapes copied by Deeds.

Appellees then calculated the costs which they would have incurred if they had produced and sold these additional tapes. Atlantic used the *actual* costs of producing tapes, including artists' royalties, that it would have paid on the sales of these tapes. Columbia, on the other hand, had previously developed for its own business purposes the average cost figures for each of 7 categories of labels for the tapes/records which it produced.[19] These cost figures were average figures for the particular label on a "per tape" or "per unit" basis, *e.g.*, for the "Columbia" label, the average cost for each unit produced was $1.87.[20] Then, after subtracting the average costs per unit for each label from its net selling price per unit for that label, Columbia obtained its average profit per unit for that label. For the "Columbia" label with a net selling price of $3.58 per tape, and an average cost of $1.87 per tape, the average profit per unit was $1.71.

This procedure used by appellees was described by the trial court in its "Opinion and Judgment" as follows:

> "The basis of determining actual damages in these cases is briefly as follows: The number of tapes produced by Deeds Music Company times the selling price of the tape had the Plaintiffs sold it, less the costs that would have been paid if the

---

**18.** Not all the tapes sold by Deeds were exact duplicates of appellees' tapes. Frequently Deeds would combine the "best", or most popular, songs from a particular artist or a particular year into one tape, entitled, *e.g.*, "Janis Joplin's Greatest Hits", or "The Best of Rock, 1970." For these combination tapes Columbia and Atlantic adjusted the number of units sold by Deeds downward by the use of fractions to compensate for the partial duplication of their tapes. In this way the figures used by appellees for the number of Deeds tapes sold would more accurately represent the amount of duplications of appellees' tapes.

**19.** These labels included "Columbia", "Epic" and various custom and budget labels (tapes or records sold at lower prices under different labels but produced by Columbia).

**20.** Of necessity, Columbia's cost figures for an entire label included royalties for *all* its artists in that particular label, not just those artists copied by Deeds. This appeared to be the principal point of difference between Columbia and Atlantic's cost figures. To be consistent, however, Columbia also used its *average* revenues for the particular label, thus yielding an *average* profit per label.

Plaintiffs had made those sales, the actual publishing costs of the Deeds' units, the American Federation of Musicians cost of seven cents a tape, the artists royalties that were paid to the artists — or would have been paid on the Deeds sales — these costs totaled together are deducted from the sales dollars and we come up with a figure of profit-loss by each Plaintiff on the Deeds sales. This method was used on the *actual* cost of the tapes involved in the case of Atlantic Recording Corp. and the *average* cost in the case of the Columbia Broadcasting System. According to all of the evidence, taking into account the losers as well as the winners, and the evidence that Deeds Music Company only copied and sold the winners, that is to say the high volume artist, Johnny Cash and the Rolling Stones and those — that using an average figure will give you a lesser apparent profit than had you used the actual figures of these winners. *So that being the evidence and the facts as established in this case, the Court feels that use of averages by Columbia Broadcasting System is at least fair if not more than fair to the Defendants in these cases."* (Emphasis added.)

The trial court apparently felt that because Columbia used its average profit per unit for an entire label, instead of its actual profit on those tapes or records copied by Deeds, it was, in effect, understating its damages.[21] We do not think the trial court was clearly erroneous in its finding that Columbia's average profit per tape would be higher for the "big-name" artists copied by Deeds than it would be for the label taken as a whole.

We also agree with the trial court that the method of using average profit figures is "at least fair if not more than fair" for the reasons above stated and also because the production figures by Lockhart were admittedly incomplete,

---

21. The trial court's award of compensatory damages equaled the full amount claimed in appellees' respective exhibits.

not reflecting all sales made by Deeds. In addition, the evidence of sales figures in the vouchers and invoices for Playgirl Industries could have supported the inference that Jack Kessler, in league with his brother Julius and others, was actually using the machinery and supplies of Deeds Music to produce additional tapes which were never reflected on the books of that company nor paid for by ALP.

Furthermore, in computing the amount of damages based on lost profits, it is not necessary to show these amounts with absolute certainty. As stated in *M and R Contractors and Builders, Inc. v. Michael, et ux.,* 215 Md. 340, 348-9, 138 A. 2d 350 (1958):

> "Courts have modified the 'certainty' rule into a more flexible one of 'reasonable certainty'. In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. *Generally, proof of actual or even estimated costs is all that is required with certainty.*
>
> "Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits." (Emphasis added.)

Federal authority is to the same effect. The Tenth Circuit Court of Appeals in *Telex Corp. v. International Business Machines Corp.,* 510 F. 2d 894 (10th Cir. 1975), *infra,* for example, cited the decision of the Sixth Circuit in *Gordon*

*Form Lathe Co. v. Ford Motor Co.*, 133 F. 2d 487 (1943) after observing "in a proceeding such as this one (unfair competition) damages can seldom be proven with mathematical certainty." In the *Gordon Form Lathe Company* case Circuit Judge Hamilton made the following observation with reference to the determination of lost profits:

> "Leaving the matter of apportionment between the Gordon patent and the Melling improvements, we now turn to the practical legal requirements which underlie the determination of profits growing out of the advantage to the Ford Company of using the Gordon machine over other known modes of shaping camshafts during the period of infringement. *In proceedings such as these there can be no mathematical certainty, nor anything approaching it, but we should reach the degree of likelihood on which reasonable men are content to act in the every day concerns of business life.*" (Emphasis added.)

Appellants' contention with respect to the compensatory awards must be rejected.

### Punitive Damages

The trial court, in its pronouncement from the bench, after describing the conduct of the corporate and individual defendants including Julius Kessler, made the following findings with respect to punitive damages:

> "The Court, in addition, thinks that these acts on the part of the Defendants acting in concert and the agreements which they made in concert, are wrong in nature and they mount up to a malicious intent or evil intent, and therefore, can be the basis for punitive damages."

Neither the Court of Appeals nor this Court has heretofore had occasion to approve an award of punitive damages in an unfair competition case in Maryland. Such damages have

been allowed, of course, in a variety of tort cases. *See* generally, *H & R Block, Inc., et al. v. Glenn B. Testerman, et ux.*, 275 Md. 36, 338 A. 2d 48 (1975); and *see, e.g., McClung-Logan v. Thomas*, 226 Md. 136, 172 A. 2d 494 (1961) (trover and conversion); *Summit Loans, Inc. v. Pecola*, 265 Md. 43, 288 A. 2d 114 (1972) (invasion of privacy); *Rinaldi v. Tana*, 252 Md. 544, 250 A. 2d 533 (1969) (tortious interference with contract).

In other states, punitive damages have been frequently awarded in cases of unfair competition arising in a variety of circumstances. *See,* Annot. "Punitive or Exemplary Damages as Recoverable for Trademark Infringement or Unfair Competition," 47 A.L.R.2d 1117 (1956).

The following are illustrative: New York — *Underwriters Laboratories, Inc. v. Smith,* 246 N.Y.S.2d 436 (1964) ($1 compensatory and $10,000 punitive damages for counterfeiting labels for power supply cords similar to those used by plaintiff); *Cutler-Hammer, Inc. v. Standard Relay Corp.*, 328 F. Supp. 868 (S.D. N.Y.1970) *aff'd* 444 F. 2d 1092 (2d Cir. 1971) (trademark infringement and unfair competition — "Defendant's conduct in these actions has been deliberate, fraudulent and wanton. As a result, plaintiff is entitled to the recovery of exemplary damages in the amount of $2,500.00 from Universal and $1,000.00 from Standard."); California — *Southern California Disinfecting Co. v. Lomkin,* 7 Cal. Rptr. 43 (1960) (unfair solicitation of customers and unfair competition — "Exemplary damages are proper in cases involving fraud and may be allowed even though the tort incidentally involves a contract."); Oregon — *American Republic Ins. Co. v. Union Fidelity Life Ins. Co.*, 470 F. 2d 820 (9th Cir. Ore. 1972) (unfair competition in use of customer lists kept by former employee — Punitive damages of $20,000 awarded — "The evidence was that Union acted in willful, wanton and reckless disregard of the rights of American."); Florida — *Miami Beach Lerner Shops v. Walco Manufacturing of Fla.*, 106 So. 2d 233 (D.C. Fla. 1958) (unfair competition in copying design of beach coats. Punitive damages of $2,000 "as punishment to defendant and as a warning and example to deter him and others from committing similar offenses in the future.").

Similarly, the U. S. District Court for Maryland allowed approximately $800,000 in exemplary damages for the misappropriation of trade secrets in *Carter Products, Inc. v. Colgate-Palmolive Co.*, 214 F. Supp. 383 (1963), stating: "This court reaffirms its finding and conclusion that the misappropriation of plaintiffs' trade secrets by Colgate was unconscionable, willful, and in bad faith, the equivalent of fraud."

In the much publicized case of *Telex Corp. v. International Business Machines Corp.*, 510 F. 2d 894 (10th Cir. 1975), *supra*, an antitrust action brought by Telex against IBM where IBM counterclaimed against Telex, the Circuit Court of Appeals affirmed the award of damages to IBM on its counterclaim alleging unfair competition including an award of one million dollars as punitive damages. With respect to the punitive damages award, the Court stated . . . "we find no abuse of discretion by the trial court in its assessment of punitive damages. Indeed, in view of what we deem to be rather flagrant conduct on the part of Telex, the trial court exhibited considerable restraint in its award of punitive damages."

In the instant case the finding of the trial court that the actions of the defendant "are wrong in nature and they mount up to a malicious or evil intent" so as to afford the basis for punitive damages was amply supported by the evidence and represents a correct application of Maryland law.

In Maryland, in order to obtain an award of punitive or exemplary damages, it has been held that a plaintiff must prove actual malice or its legal equivalent. *H & R Block, Inc., et al. v. Glenn B. Testerman, et ux., supra; Seigman v. Equitable Trust Co.*, 267 Md. 309, 315, 297 A. 2d 758 (1972). The legal equivalent of actual malice is, as Judge Levine pointed out in *Testerman, supra,* frequently labeled implied malice. The Court of Appeals in *Drug Fair v. Smith,* 263 Md. 341, 352, 283 A. 2d 392 (1971) defined actual malice in the following terms:

"Actual or express malice may be characterized as the performance of an unlawful act,

> intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and wilfully injure the plaintiff."

Here, there is no evidence of hate or rancorous motive. We are, however, confronted with a course of misconduct constituting unfair competition through the device of misappropriation.[22] On the record before us, there can be no doubt that these acts of unfair competition were practiced intentionally, wantonly and without legal justification or excuse. This is implied malice or the "legal equivalent" of actual malice, and is, we think, what the Court of Appeals contemplated in *McClung-Logan v. Thomas*, 226 Md. 136, 148, 172 A. 2d 494 (1961), *supra,* when Judge Marbury stated for the Court:

> "Punitive damages are properly a question for the jury in an action for wrongful conversion of personal property where the act of the defendant is accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury."

And as Judge Smith pointed out in the case of *St. Paul at Chase v. Manufacturers Life Insurance Co.*, 262 Md. 192, 278 A. 2d 12 (1971) with reference to the term "wanton":

> "We interpret the language of those cases which speak of wanton conduct or wantonness as being a basis for awarding punitive damages as referring to such conduct as would carry an implication of malice or as conduct from which one would draw a necessary inference of malice, conduct from which one might determine the existence of actual malice."

---

22. As previously indicated, fn. 1, the duplication of tapes is a criminal offense in some 26 states, including New York since 1967 and Maryland since July 1, 1973. New York was the principal place of business of each of the appellants at all times involved in this case.

In 1 *Sedgwick on Damages,* § 367, the author states: "If the injury was inflicted through fraud, this alone affords ground for exemplary damages; and so where the injury is done with corrupt motives; since in such a case the injury is necessarily malicious," citing *Baltimore & Ohio R.R. Co. v. Boyd,* 63 Md. 325 (1885).

Certainly in this case there was evidence of "corrupt motives" sufficient to support the trial court's finding of malice and evil intent on the part of the appellants and the situation is clearly one for the effectuation of the salutary purpose of exemplary damages not merely to enhance compensatory damages but to penalize the tort-feasors and to deter others because of the wanton, wilful and oppressive character of the acts complained of. *See* 22 Am.Jur.2d Damages, § 236; Restatement 2d Torts (Tentative Draft 1973) § 908. As the Supreme Court of California stated in *Ward v. Taggart,* 336 P. 2d 534, 538 (1959) punitive damages "are appropriate in cases like the present one (unfair competition) where restitution would have little or no deterrent effect, for wrongdoers would run no risk of liability to their victims beyond that of returning what they wrongfully obtained."

In an effort to avoid the impact of the trial court's findings, appellants contend in their brief that their conduct throughout was "based upon the *correct advice* of attorney Lockhart, after legal research disclosed the existence of compulsory licensing in the Copyright law, as defendants did comply, with the prerequisities of notices of intent to copy, and tender of 2 cents per copy [sic]." (Emphasis added.)

It cannot seriously be maintained that in November, 1971, there was an attorney-client relationship between Mr. Lockhart and the appellants in this case. They were then co-adventurers in what the trial court found to represent a scheme to misappropriate the exclusive property of the appellees; and it is patent that none of the appellants and only Lockhart himself acted upon his own advice. The advice was *not* correct. It was at variance with decided cases in at least two United States Courts of Appeals and was

supported only by one United States District Court Judge whose decisions have since been reversed; [23] and it completely missed the question of civil liability for common law unfair competition.

The appellants, including the ubiquitous Corporate President, Julius Kessler, carefully planned and pursued in Maryland an activity which was proscribed by a criminal statute in New York where they maintained their principal place of business but which, in Maryland, was not then a criminal offense. The enterprise was clandestine, conducted in a windowless white concrete building in a secluded area in Elk Mills. We consider it a reasonable and fair inference that the appellants were vastly more informed of the legal risks of their duplicating activity, and significantly more experienced, than was Mr. Lockhart. We reject out of hand their argument that "reliance in good faith upon Lockhart's legal advice mandates denial of punitive damages."

Finally, with reference to appellants' assertion that "no *prima facie* case for punitive damages was made against the individual defendant, Julius Kessler," the Court of Appeals has spoken as follows with reference to the individual liability of corporate officers sued as joint tortfeasors with their corporations:

> "The general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Tedrow v. Deskin,* 265 Md. 546, 550, 290 A. 2d 799 (1972).

*Judgments affirmed; appellants to pay the costs.*

---

23. *See* note 13, *supra.*