OFFICIAL AVIATION GUIDE CO., Inc., v. AMERICAN AVIATION ASSOCIATES, Inc., et al.

AMERCAN AVIATION ASSOCIATES, Inc., v. OFFICIAL AVIATION GUIDE CO., Inc., et al.

No. 8688.

Circuit Court of Appeals, Seventh Circuit. June 15, 1945.

Rehearing Denied Aug. 9, 1945.

174

Wilfred S. Stone, J. Glenn Shehee, Hayes, Shehee & Quigley and Stone, Artman & Bisson, all of Chicago, Ill., for appellants.

Clarence J. Loftus, John J. Kelly, and John J. Enright, Jr., all of Chicago, Ill., for appellee.

S. G. Tipton and D. W. Markham, both of Washington, D. C., for amicus curiae.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Plaintiff sued defendants, American Aviation Associates, Inc., and three of its employees for copyright infringement and unfair competition. The court found defendants guilty of infringement for their violation of plaintiff's property rights in plaintiff's copyrighted publication and of unfair competition, and entered a decree granting plaintiff a perpetual injunction and an accounting of profits and damages resulting from such acts. Defendants appeal from this decree.

The April through July, 1943, issues of defendants' monthly magazine, *Universal Airline Schedules* (hereinafter referred to as *Schedules)*, are accused of infringing the January through May, 1943, issues of plaintiff's copyrighted monthly magazine entitled *The Official Guide of the Airways* (hereinafter referred to as *Guide).*

The issue on this appeal is narrowed somewhat by plaintiff's admission that no point is made of any infringement by reason of the promotional display pages carried by both publications. Further narrowing of the issue comes through the general agreement of all parties that the information contained in the two publications lies in the public domain. That is, the informational data and facts relating to air travel, air mail, air express, priorities, flight schedules, fare tables, and general information concerning the airlines are open to everyone, being on file with the Civil Aeronautics Authority and distributed by the airlines in their publicly accessible timetables. Hence the information per se is not copyrightable, and plaintiff does not contend it is. Yet plaintiff relies primarily on the "listing section" of its publication as a basis for its charge of infringement. The greater part (approximately two-thirds) of both magazines consists of this "listing section," which is similar to a railroad timetable, giving similar information, i. e., the time a plane leaves a certain city, time it arrives at the next city on the route, fares, etc. What plaintiff contends is that its copyright is infringed because defendants copied its style, garb, sequence, arrangement, treatment, expression, and plan of compilation.

Our problem, then, is primarily one of comparing the two magazines to see whether defendants' magazine actually does, as plaintiff asserts, copy plaintiff's. We note first that the outside covers, both front and back, are so completely dissimilar that no one could be confused or misled into buying one thinking he was buying the other. *Guide's* cover is predominately blue with some white and a little black, with the title at the top and clouds and two small white airplanes in the background. A quick reference index in a white box in the center of the cover stands out prominently, as do the words "Air Travel," "Information," and "Timetables . Fares . Routes," printed in white. At the bottom, in black, appears "Official Publication of the Airlines." The winged symbol of a tiny globe with the letters OGA therein, its trade-mark, also is distinctive. On the back cover is a map of the United States, bordered in blue, in bluish-white and black, showing cities and U. S. Air Mail Routes in black. *Contrast the cover on Schedules,* which is red and black with its title in a different style type of a different size, positioned just above the center of the cover; the title is superimposed on a large globe and curves with it. An airport is silhouetted in the lower third of the cover, above which clearly appear the words "United States And International Passenger, Air Mail, and Cargo Information." Also, at the foot of the cover appears *"An American Aviation Publication."* On the back cover appear the insignia of the various airlines arranged about a gray figure of Mercury. From the salient features of the two covers, it is clearly apparent to sight and understandingly evident to the senses that they are so completely different as to preclude any confusion. Hence if by "garb," plaintiff means the exterior raiment of its publication, there is no copying.

■ Further comparison of the style and garb of the two publications shows that *Guide* has the airline code letter in the upper outer corner of each listing page whereas *Schedules* has a table number in the upper outer corner. In *Guide* the on-line schedules are numbered consecutively and keyed to the various maps. In *Schedules* the first on-line schedule of each airline is given a number which is ordinarily a multiple of five or ten and succeeding on-line schedules receive numbers consecutively, so that an on-line schedule can be added to an airline without necessitating renumbering the on-line schedules that appear at a following point in the book. These numbers are keyed to the maps. While it is true that both publications key their timetables to maps, such keying was common in railway and airline guides before plaintiff's time and plaintiff may not monopolize it to the exclusion of defendants. Perris v. Hexamer, 99 U.S. 674, 25 L.Ed. 308.

The five issues of *Guide* lack uniformity as to type sizes and type faces, fare tables (some showing one-way fares only, some, one-way fares plus tax, and some, one-way and round trip fares), symbols, and internal arrangement of the listing of the particular airline; and *Guide* differs from *Schedules* in that schedule heading and size of type usually differ, use of light

and dark type differs, and positioning of tables differs, so that the contents of any two comparable pages in the two publications are not identical.

Comparing the March *Guide* and the April *Schedules* as to sequence and arrangement we find the following:

■ So far as the internal arrangement of each listing goes, it is true that there is some resemblance, but this arises largely from adherence to the form sanctioned by custom, usage, and general practice in presenting railway and airline timetables and fare tables. Furthermore, it is not strange

| *Guide* | *Schedules* |
| --- | --- |
| 1. United States Map | 1. Publication and Services of American Aviation Associates, Inc. |
| 2. Masthead and Contents and Airline Companies | 2. Masthead and Table of Contents and Airlines |
| 3. No comparable material | 3. Latin American Index by Countries and Airlines |
| 4. Although headed Editorial, this actually contains recent flight information, *c. g.,* "Effective March 1, 1943, Chicago and Southern Airlines will operate from Memphis to Shreveport and Houston via Little Rock, Arkansas." | 4. Editorial, an editorial in the usual sense of the word, *e. g.* "Founded on a premise of service to an industry in the future of which it has full confidence" this "first issue * * *." |
| 5. Priorities | 5. Priority information |
| 6. Quick Reference Index to airways schedules | 6. No comparable page |
| 7. Domestic Airline Listings arranged according to seniority of listing with *Guide* | 7. Domestic Airline Listings arranged alphabetically |
| 8. No comparable material | 8. Abbreviated South American Listings |
| 9. Mexico-Central America-West Indies Map and South American Map | 9. No comparable arrangement (Maps appear at end of magazine) |
| 10. Not stated here | 10. Air Express |
| 11. Foreign Listings | 11. Air Mail |
| 12. Hotel Directory | 12. No comparable information |
| 13. Interline Reservations Guide | 13. International Code |
| 14. Passport and Visa Requirements | 14. International Travel Information |
| 15. No comparable heading | 15. Money and Exchange Rates |
| 16. Foreign Consulates in the United States at which Visas Can Be Obtained | 16. Certificated United States Routes and Stops |
| 17. United States Air Mail—Domestic | 17. Directory of Aeronautical Organizations |
| 18. United States Air Mail—Foreign | 18. Indices |
| 19. Alaska-Canada-Newfoundland and Latin American Indices | 19. Maps |
| 20. Alaska-Canada-Newfoundland Map | 20. No comparable page |

From this comparison it is apparent that although much of the information carried by the two magazines is the same, the sequence and arrangement thereof are not identical. Nor are they similar enough to warrant the charge of infringement.

that the airlines want the particular pattern of their timetables to be the same in all publications. Since the airlines were paying both to carry this information, they had the right to have some say in how it was to be presented, just as an advertiser may

direct an editor to present his advertising material in a certain way. Here, in many cases the airlines furnished the "lay-out" or description of the arrangement desired. They reserved the right to alter the arrangement of this material from time to time within the limitation of the space purchased. On this point, we note that 15 major airlines have filed a brief, as amici curiae, asking that the decision below, which they assert is erroneous, be corrected. They point particularly to the ruling, as a matter of law, that plaintiff, as publisher, by copyrighting each issue as a whole, acquired a copyright on "all the component parts thereof," and that that copyright is the "sole property" of the publisher, which in view of defendants' contentions must mean, they say, that the publisher's copyright attaches to all of the commercial advertising or listings appearing in the magazine, and that the publisher can maintain an action for infringement against the publisher of any other magazine which carries an identical advertisement or listing—even though the advertising or listing copy was furnished by the advertiser or lister and even though both publishers were not only authorized but were paid their standard space rate by the advertiser to publish the advertisement or listing. Although there is some doubt whether the court intended to hold this, it is of sufficient importance to warrant discussion. If the District Court so held, the holding is erroneous. It is contrary to law and business practice. The airlines did not part with all interest in the material furnished to the plaintiff for their listing section. On the contrary, they prepared it and paid plaintiff to publish it. Plaintiff's contribution was limited to editorial revision, and even that contribution was unnecessary in some cases. Since whatever service plaintiff performed was covered by the advertising rate or listing fee charged by plaintiff and paid by the airline, plaintiff did not get the exclusive property right therein. In response to this argument plaintiff urges that it never asserted a monopoly of the facts and information per se, and all it objects to is copying and clothing the facts in plaintiff's style and garb. We have already observed defendants' publication does not present the facts in the identical style and garb of plaintiff's. Moreover, it is obvious that the airlines must, as a matter of sheer business neces-

sity, make that information readily available to the users of their services, and that they must retain the privilege of presenting it in other publications in the form they consider most convenient and practical. By listing with plaintiff they did not part with this privilege. It is hard to see what would be accomplished by holding that these schedules and tables must be arranged differently in each publication in which they appear. Certainly it would breed lack of public understanding and tend to defeat what the airlines want most to achieve. Even the Campbell Soup Company does not compose a different advertisement for each magazine in which it purchases space; yet the Campbell's Soup advertisement is not expected to be used as a constant reference by hundreds of persons as is the airlines' "listing" material. Even though there be some similarity between the two magazines in the listing of a particular airline's schedules and fares, this does not warrant the decree granted by the court.

Nor do the three authorities cited by plaintiff change our conclusion. Section 41 of the Copyright Act of March 4, 1909, 17 U.S.C.A. § 41, and Houghton Mifflin Co. v. Stackpole Sons, Inc., 2 Cir., 104 F.2d 306, are irrelevant. Jewelers' Circular Pub. Co. v. Keystone Pub. Co., D.C., 274 F. 932, affirmed, 2 Cir., 281 Fed. 83, 26 A.L.R. 571, is distinguishable because there the plaintiff had at its own expense created the directory and had produced the illustrations of the trade-marks from cuts generally prepared "by the plaintiff personally," whereas here the airlines paid plaintiff to print their listings and their employees played a major role in creating them.

The similarity of treatment in the two magazines springs from the similarity of source material and type of information to be presented. That coincidence of treatment which merits a valid charge of infringement does not exist.

■ As for expression, plaintiff has not pointed out any copying of extended passages or text. Plaintiff relies on a few scattered and disparate "common errors" to show copying of plaintiff's magazine. The trial judge noticed these errors and on the authority of Adventures in Good Eating v. Best Places to Eat, 7 Cir., 131 F.2d 809, held that they showed copying. But that case is clearly distinguishable because

178

no explanation for the existence of the common errors was offered, whereas here defendants have fully explained how these errors came about. Not only did defendants introduce some 1700 pages of letters, data, and source material, which are here before us and show that they did not short-cut the laborious work of creating their magazine from original information supplied by the airlines, but they also have traced the so-called "common errors" to their source. For example, in the Transcontinental and Western Air listing in both publications there is a reference to "this folder." Since neither publication is a folder, the terminology is erroneous. This shows a common source, namely, the material sent to plaintiff and to defendants by the airlines. Sources are given for "Salvador" instead of "Sao Salvador" and "S. Paulo" instead of "Sao Paulo de Olivenca," and brevity, too, would induce their use. Making "Cutbank" one word, instead of "Cut Bank," appears to have been a printer's error. It is impossible to review each of the errors; it will suffice to say that defendants have explained how they occurred. The mere fact that defendants had knowledge of plaintiff's publication and even used it for verification purposes, such as proper abbreviation and spelling, should not be allowed to deprive defendants of their right to publish the information obtained from the airlines, for such use is not unfair.

Some "common errors" arose from the fact that the airlines sent to defendants material clipped from the *Guide* with instructions to publish it in their respective listing sections in *Schedules*. Most of this material was not used and defendants requested these airlines to furnish original copy. Some of this was probably copied from previous *Guides*. Now, the question is, was it illegal for defendants to print this original copy, or even assuming the clippings from the *Guides* were used, was it illegal to print them in *Schedules?* Although there is controversy as to whether the airlines paid $4 per page to compensate *Guide* for its editorial and revisory work and controversy as to whether the compensation paid by an airline company to *Guide* constituted a listing fee or an advertising rate, it is clear that the airlines paid *Guide* to carry their listing. The evidence in the record, especially Chase's testimony, forces the inference that *Guide* received $4 more per listing page than from a promotional page, the $4 being payment for revising and arranging (and thus "styling and garbing") the data sent in by the airlines. Moreover, the airlines necessarily had a large part in creating the listings. In this situation, the airlines had the right to copy their own particular listings and to authorize *Schedules* to carry them in substantially the same form, omitting plaintiff's unique features such as the code letter in the upper outer corner. The equitable title to the listing remained in the airline which had paid for the advertisement or listing. Since *Guide* had been paid for editing the airlines' listings and since there was no express understanding between *Guide* and the airlines that *Guide* was to have a complete monopoly over the listings which the airlines had helped to create and had financed, it cannot be presumed that they had parted with the right to duplicate the advertisement or listing in another magazine, particularly where, as here, defendants had made paste-ups and lay-outs of the clippings which in virtually all instances materially altered the presentation and concatenation of the material and changed the typographical make-up. Lamb v. Evans, 1 Ch.Div. 218 (Law 1893); cf. Brown v. Mollé Co., D.C., 20 F.Supp. 135; Yardley v. Houghton Mifflin Co., 2 Cir., 108 F.2d 28; and Grant v. Kellogg Co., D.C., 58 F.Supp. 48.

Plaintiff also charges defendants with unfair competition. Defendants cannot properly be charged with appropriating the good will of plaintiff's publication because there is no evidence showing confusion in the minds of purchasers. Chase edited the *Guide* up to April, 1940, when he severed his connections with plaintiff. He was hired by defendants more than two and one-half years after his employment with plaintiff had terminated.

Knowledge confidentially gained in the course of employment may be made the subject of restrictive agreement, but an employer cannot prevent his employee from using the skill and intelligence acquired through experience received in the course of the employment. The employee may achieve superiority by every lawful means and upon the rightful termination of his contract use that superiority for the benefit of rivals in business of his former em-

ployer. Club Aluminum Co. v. Young, 263 Mass. 223, 160 N.E. 804, 806, and Woolley's Laundry Inc. v. Silva, 304 Mass. 383, 23 N. E.2d 899, 126 A.L.R. 752; consequently hiring Chase did not constitute unfair competition. Professional Service Corporation v. Johnson, 316 Ill.App. 431, 45 N.E.2d 191; American Cleaners & Dyers v. Foreman, 252 Ill.App. 122. Nor did selection of Chicago as a point of publication and printing amount to unfairness. Nor was it unfair of defendants to employ the same printer who printed plaintiff's publication, especially since only a very few printers possessed the necessary machinery and equipment to print the magazine. Nor was there anything improper in defendants' attempts to buy plaintiff's publication prior to starting their own publication. Finally, the combining of all these acts does not, in our judgment, constitute unfair competition. In reaching this conclusion we have not overlooked Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc., 317 Ill.App. 451, 46 N.E.2d 165, and Boylston Coal Co. v. Rautenbush, 237 Ill.App. 550, which plaintiff pressed upon us in oral argument. Those cases are readily distinguishable. In the former, a lingerie shop proprietor was restrained from using "Lady Esther" in its name, notwithstanding there was no competition between its products and the cosmetics of the plaintiff. The case does not furnish any authority for restraining defendants here because the name of defendants' publication is so different that there is no possibility of any purchaser thinking the one is the other. Moreover, the source (publisher) of each magazine is stated on the cover so clearly as to preclude any confusion. In the Boylston case, the list of agents which the employee was held to have wrongfully appropriated was confidential, unique, and in itself a source of sales and profit so as to be a definite and valuable property right, whereas here the airlines' schedules were publici juris.

Taking all of the foregoing into consideration, there is no unfair competition.

The decree is reversed and the case is remanded to the District Court with directions to dismiss the complaint.

Defendants' counterclaim has no merit, and we affirm the District Court's dismissal thereof.

It is so ordered.