John I. JACOBS, d/b/a the New Hampshire Classified Guide

v.

Roger ROBITAILLE, d/b/a the Merrimack Valley Free Classifieds Weekly.

Civ. A. No. 75–132.

United States District Court, D. New Hampshire.

Jan. 6, 1976.

3. The hospital discharge note shows that Ms. Harper was given valium and aspirin as medication for her pain.

Grenville Clark, III, McLane, Graf, Greene, Raulerson & Middleton, Manchester, N. H., for plaintiff.

Lee A. Strimbeck, Derry, N. H., for defendant.

OPINION

BOWNES, District Judge.

Plaintiff is the publisher and seller of a weekly booklet entitled "The New

Hampshire Classified Guide" (hereinafter referred to as "Guide").

"Guide" is a seventy page compilation of approximately fifteen hundred classified ads which is published every Wednesday and distributed in southern New Hampshire and northern Massachusetts. Defendant is the publisher and seller of a weekly booklet entitled "Bargain Classifieds" (hereinafter referred to as "Bargain"). "Bargain" is a seventy page compilation of approximately fifteen hundred classified ads which is published every Wednesday and distributed in southern New Hampshire and northern Massachusetts.[1]

Plaintiff brings suit alleging that defendant has violated the federal copyright laws, 17 U.S.C. § 1 et seq., and engaged in unfair competition. Jurisdiction is based on 28 U.S.C. § 1338(a) and (b).

On June 5, 1975, after an evidentiary hearing, a preliminary injunction was issued enjoining defendant "from copying materials appearing in plaintiff's publications. . . . " (The evidence introduced at the hearing is part of the present record. Fed.R.Civ.Pro. 65(a)(2).) On December 2, 1975, a hearing on the merits was held.

## FACTS

"Guide" has been published on a weekly basis since August 27, 1973; it did not, however, obtain federal copyright protection until April 14, 1975. During this interim period, plaintiff published numerous uncopyrighted issues of the "Guide" which were substantially similar in both format and appearance to the later copyrighted editions. These common features include: pamphlet size, type of paper, bleedover border, language of the ad form, mast head, and display box. The parties have stipulated that the earlier uncopyrighted editions were copyrightable. (Stipulation No. 3.)

Prior to publishing his own periodical, defendant worked for the plaintiff as an independent distributor and served one hundred sixty store outlets in the Manchester, Milford, and Nashua area. While working for plaintiff, defendant was considering establishing his own publication and he investigated printing and designing costs to determine whether such a venture was economically feasible. Defendant acquired considerable business knowledge concerning plaintiff's method of operation, business, and distribution system during the period he was a distributor for the plaintiff.

After distributing the "Guide" for approximately seven months, defendant approached Alfred Campbell, plaintiff's business manager, and informed him that he wanted a larger financial interest in the business and asked for an expansion of his assigned routes. Campbell refused. Defendant informed Campbell that, if he was not given more responsibility, he would terminate their relationship and would form and publish a rival publication. Campbell still refused and, in the middle of February, 1975, defendant terminated his association with plaintiff.

After leaving plaintiff, defendant distributed "The Want Advertiser," a publication which is similar in scope and purpose to the "Guide," for thirteen weeks. While distributing the "Advertiser" he found that there was a certain amount of confusion generated in the buying public as to the "Advertiser's" source. Nevertheless, his commercial appetite being further whetted, defendant decided to bring out a publication of his own.

Defendant examined the other principal classified ad booklets and culled from them what he considered to be the best commercial features before finally choosing his design.[2] He decided on a bleed-

---

1. Defendant previously entitled his publication "The Merrimack Valley Free Classifieds Weekly," but he testified that he was forced to change the name because people strictly interpreted the word "Free" and walked off with the booklet without paying for it.

2. There are three other periodicals of the same nature: "The Want Advertiser"; "The Bargain Hunter's Guide"; and "The Cape Advertiser."

over border and a two color format for his front page; this design is very similar to the one adopted by plaintiff and defendant knew that this similarity would cause commercial confusion.

The design plate for defendant's booklet was designed by Bob Waugh, a graphic designer, and defendant knew, after speaking to him, that Waugh had also designed the name plate for plaintiff's publication. In addition, when preparing his ad form, defendant told Waugh to use plaintiff's as a model. The two forms are similar, but not identical.[3]

On May 7, 1975, the first volume of "Bargain" was published. This publication was similar, if not identical, to plaintiff's publication in the following respects: (1) size of publication; (2) type of paper; (3) serif type face; (4) internal format; (5) bleedover border; (6) price; (7) official date of publication; and (8) two color front page format.

Of equal concern to plaintiff is the fact that 20%–26% of the ads contained in defendant's first publication were pirated from a copyrighted issue of the "Guide"; 12% of the ads contained in defendant's second publication were pirated from a copyrighted issue of the "Guide"; and, in defendant's third publication, 1%–2% of the ads contained therein were pirated from a copyrighted issue of the "Guide." The defendant, when copying these ads, did not simply photostat them, but retypeset them and, in some cases, rearranged them on the page interspersed with ads taken from other sources.

"The publications of both the plaintiff and the defendant are identical in purpose and nature. They both consist of a compilation of classified advertisements.

The advertisements are collected, assembled, sorted, edited and printed in booklet form. The booklet is then sold to the public, typically through displays near checkout counters of retail establishments, such as grocery stores. With exceptions not pertinent to this case . . . the advertiser pays no fee for the publication of his ad. Advertisements for future publication are solicited from readers through the means of an 'ad order form' appearing in the booklet." (Stipulation No. 11.)

When advertisements are received, they are sorted by category and each advertisement is edited so that typographical and grammatical errors are corrected and when they are retypeset, the first few words are placed in bold face type. The principal body of the advertisement, however, is written by the advertiser and its basic form and structure are not changed. The parties have also stipulated that the publications are bought on impulse when a person sees them near the checkout counter.

Defendant admitted that his publication generated confusion in the buying public as to its source, but he testified that this confusion hurt his own business in that he was unable to establish his own commercial identity.

Campbell testified that, as a consequence of defendant's pirating certain advertisements from plaintiff's publication, he received approximately six complaints a week from customers who were receiving telephone calls from prospective purchasers long after their ads should have expired. He testified that the ads run on the average of two weeks and that, due to defendant's activities, some ads were on the public market for more than six weeks. He testified that

---

3. In an uncopyrighted edition, plaintiff's ad form reads as follows:

> To place an ad, simply rip this page out of the book and fill out the form below. Scotch tape or staple the ends, place a stamp on the back, and throw it in the mail. It's very simple and very cheap. You simply supply the ad and postage. (Deft's. Ex. 11–A.)

Defendant's ad form reads as follows:

> To place an ad, remove this page from the book and fill out the form below. Scotch tape or staple the ends, put a stamp on the back, and place it in the mail. It's a very inexpensive way to advertise. (Pl's. Ex. 4–A.)

plaintiff's good will was injured as a result of defendant's actions.

Campbell also testified that plaintiff and defendant use the same store outlets in order to sell their publications, and that defendant rearranged plaintiff's displays so as to give his publication greater public exposure. Defendant did not deny this practice, but argued that it was an established part of this type of business, and that when he worked for plaintiff he engaged in similar practices. Campbell also testified that in some stores plaintiff's rack and publication were removed from public view and defendant's rack and publication were inserted in their place.

## ISSUES

This suit raises two issues: (1) whether defendant is liable, under federal copyright laws, for infringing plaintiff's copyright; and (2) whether, under New Hampshire common law, defendant can be found liable for engaging in unfair competition.

## THE LAW

■ Although plaintiff's compilation of classified advertisements was copyrightable, he published his booklet for approximately one and one-half years without obtaining copyright protection. Consequently, the material contained in these publications, including the external design cover,[4] was dedicated to the public and could be freely copied without offending the federal copyright laws. 17 U.S.C. § 8. Once a work has been injected into the public domain, all of its copyright protection "is lost permanently and cannot be restored or reclaimed." Ringer & Gitlin, "Copyrights," at 15 (Practicing Law Institute 1965).

It is undisputed that defendant pirated advertisements from copyrighted editions of the "Guide." The narrow question is therefore: Who is the copyright proprietor of advertisements—the advertiser or publisher?

17 U.S.C. § 9 provides that the rights of copyright reside in "[t]he author or proprietor of any work made the subject of copyright by this title, or his executors, administrators, or assigns, . . ." The essential question is whether plaintiff is statutorily capable of copyrighting these ads.

The advertiser writes his own ad. In order to submit an advertisement, he fills in a blank "ad form" and provides a written description of the article to be sold along with its condition and price. Plaintiff is not involved in the writing of these ads and his task is merely to categorize the advertisements and edit them. In essence, the original advertisement is very rarely changed.

■ Advertisements are copyrightable. *Bleistein v. Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903); *see generally*, Borden, Copyright of Advertising, 35 Ky.L.J. 205 (1947); Savord, The Extent of Copyright Protection for Advertising, 16 Notre Dame Lawyer 298 (1941). Advertisements that are contained in periodicals are also copyrightable and the copyright proprietorship can be lodged in the publisher. *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965).

■ The advertisements involved in this suit are not extravagant commercial undertakings involving complex art work or Madison Avenue phraseology. *Bleistein, supra.* Instead, the advertisements are tersely worded and attempt to provide the maximum amount of information with the minimum number of words. The fact that these advertisements do not involve creative genius does not detract from their copyrightability. In order to obtain a copyright, the "writing" must be original and created by the author's own efforts. 17 U.S.C. § 4. Only a minimal amount of

---

4. It is possible to infringe upon a copyrighted "style, garb, sequence, arrangement, treatment, expression, and plan of compilation." *Cf. Official Aviation Guide Co. v. American Aviation Assoc.*, 150 F.2d 173, 175 (7th Cir.), *cert. denied*, 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469 (1945).

creativity is necessary to support a copyright. *Donald v. Uarco Business Forms,* 478 F.2d 764, 765 (8th Cir. 1973). "Thus, almost any ingenuity in selection, combination or expression, no matter how crude, humble or obvious, will be sufficient to render the work a [copyrightable] writing." Nimmer, On Copyright, vol. 1 § 8.32 at 20 (1975). *See also,* Note, Copyright—Study of the Term "Writings" in the Copyright Clause of the Constitution, 31 N.Y.U.L.Rev. 1263 (1956).

■ Plaintiff argues that he is the proprietor of these advertisements because (1) the advertiser intends to assign his right of copyright when he submits the advertisement or (2) the publication is a compilation of advertisements and the entire publication, including all advertisements contained therein, were properly copyrighted. Plaintiff's arguments must fail. I find that the right to copyright the advertisements was that of the advertisers who prepared them and not the publisher.

Courts that have addressed themselves to this precise issue have found that the advertisers, who usually have little or no knowledge of the copyright laws and its ramifications, do not intend to assign their rights to the publisher. *Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565, 568 (2d Cir. 1966); *Inter-City Press, Inc. v. Siegfried,* 172 F.Supp. 37, 45 (W.D.Mo.1958); *Press Publishing Co. v. Atlantic County Adv., Inc.,* 59 N.J. 356, 283 A.2d 102 (1971). *See also, Electronic Publishing Co. v. Zalytron Tube Corp.,* 376 F.2d 592 (2d Cir. 1967); *Advertising Exchange v. Witten Hardware Co.,* 50 F.Supp. 137 (W.D.Mo. 1942).

The reason for refusing to infer an intent to assign, in the absence of a written agreement is simple. It seems highly probable that persons who submit these advertisements intend to advertise in as many publications as possible; their chief concern and objective is to sell their goods. I am sure that an advertiser would be highly surprised to learn that, if he submitted an ad to

"Guide," he would be liable, under federal copyright laws, for submitting the same advertisement to "Bargain." *Brattleboro, supra,* 369 F.2d at 569 (Lumbard, J., concurring.) Accordingly, in the absence of an agreement to the contrary, courts should assume that the advertiser who prepared the ad "reserves copyright in the advertisement, and merely grants to the newspaper or periodical a license to print it." Nimmer, *supra,* vol. 1 § 24.-41 at 109 (1975); *Official Aviation Guide Co. v. American Aviation Assoc.,* 150 F.2d 173, 177 (7th Cir.), *cert. denied,* 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469 (1945).

■ I find that plaintiff has only received a license to publish from the advertisers and that he cannot qualify as a "proprietor or assign" and, therefore, he does not have the right to obtain copyright protection. *Egner v. E. C. Schirmer Music Co.,* 139 F.2d 398, 399 (1st Cir.), *cert. denied,* 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1943). When the advertisers consented to the publication of their writings, by sending their ads to the plaintiff, their work was dedicated to the public and could be freely copied. Nimmer, *supra,* vol. 1 § 24.41 at 109.

■ Plaintiff argues that, even if the advertisements were not copyrightable by him because of the advertisers' failure to properly assign their rights, defendant's pirating of advertisements infringed his copyright protection. In support of this proposition, plaintiff cites *Markham v. A. E. Borden Co.,* 206 F.2d 199 (1st Cir. 1953). *Markham* is inapposite. The line of cases which holds that compilations are copyrightable is irrelevant when, as here, the essential issue is whether the author-advertisers intend to assign their copyright interests to the publisher. *Cf. Brattleboro, supra,* 369 F.2d at 568; *Official Aviation Guide, supra,* 150 F.2d at 177. Since I have found that the advertisers did not intend to assign their rights, plaintiff's general copyright does not extend to the individual ads. "Copyright must be obtained by the proprietor of the material and cannot be derived from a general copy-

right on a magazine or other periodical in which the material may be published." *Moger v. WHDH, Inc.*, 194 F.Supp. 605, 606 (D.Mass.1961). *See also, Mills Music v. Cromwell Music*, 126 F.Supp. 54, 65 (S.D.N.Y.1954).

Assuming, *arguendo*, that plaintiff could obtain copyright protection for these advertisements, Nimmer suggests that "for some purposes an advertisement is not to be regarded as a contribution to a periodical, [and] a cautious approach would suggest a separate notice be placed on or adjoining the advertisement." Nimmer, *supra*, vol. 1 § 24.41 at 109–110; *cf.* Ops.Atty.Genl. No. 136, 46 U.S.P.Q. 572 (1940). For the foregoing reasons, I find that defendant's taking of advertisements from plaintiff's publication did not violate the federal copyright laws.

## UNFAIR COMPETITION

The claim of unfair competition is determined and delineated by state law. *Pecheur Lozenge Co. v. Nat. Candy Co.*, 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103 (1942); *see also*, 1A Moore's Federal Practice ¶ 0.326 at 3771–3772 & n.12 (1974); 1 Moore's Federal Practice ¶ 0.60[8.–7] at 659–662 (1975); *cf. National Fruit Product Co. v. Dwinell-Wright Co.*, 47 F.Supp. 499, 503–504 (D.Mass.1942), *aff'd*, 140 F.2d 618 (1st Cir. 1944).

The legal concept of unfair competition is "the child of confusion." *Schmidt Manufacturing Co. of S. C. v. Sherrill Industries, Inc.*, 249 F.Supp. 480, 487 (W.D.N.C.1965). It is a broad equitable doctrine that has evolved in response to predatory business practices and is designed to enforce "increasingly higher standards of fairness or commercial morality in trade." *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144, 145 (3d Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953). *See generally*, Note, Developments in the Law—Competitive Torts, 77 Harv.L.Rev. 888 (1964).

■ Applying "commercial morality" to a particular set of facts is a difficult judicial task for it can be cogently argued that such a concept is a *non sequitur*. Nevertheless, the law has provided that a person is liable for unfair competition if he engages in conduct which deceives the general buying public. *DeCosta v. Columbia Broadcasting System, Inc. (DeCosta II)*, 520 F.2d 499, 513 (1st Cir. 1975), *petition for cert. filed*, 44 U.S. L.W. 3376 (U.S. Nov. 11, 1975) (No. 75–752). The standard is easier to state than apply for the "child of confusion," has matured, become fertile, and spawned a body of law that lacks in judicial definition and scope. *Compare, Columbia Broadcasting System, Inc. v. DeCosta (DeCosta I)*, 377 F.2d 315 (1st Cir.), *cert. denied*, 389 U.S. 1007, 88 S.Ct. 565, 19 L.Ed.2d 603 (1967), *with DeCosta II; see also, Columbia Broadcast. Sys., Inc. v. Melody Record., Inc.*, 134 N.J.Super. 368, 341 A.2d 348 (App.Div.1975).

Plaintiff's charge of unfair competition can be broken down into two categories: (1) defendant unlawfully misappropriated advertisements from plaintiff's publication; and (2) defendant designed the cover and format of his publication so as to confuse and deceive the buying public.

## MISAPPROPRIATION OF ADVERTISEMENTS

In *DeCosta I*, the First Circuit, in interpreting the *Sears-Compco* decisions,[5] held that "if a 'writing' is within the scope of the constitutional clause, and Congress has not protected it, whether deliberately or by unexplained omission, it can be freely copied." *Id.* at 319. The Court held that the misappropriation doctrine enunciated in *International News Serv. v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), was "no longer authoritative" and dismissed plaintiff's claim. *Id.* 377 F.2d at 318. Under the *INS* doctrine of misappropriation, a plaintiff was entitled to judicial

5. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964);

*Compco Corp. v. Day-Brite Lighting*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

relief if he could establish that: (1) time, effort, and money were expended towards creating the thing misappropriated; (2) that defendant appropriated the material at little or no cost; and (3) that plaintiff has suffered commercial harm. *See,* Aherns, The Misappropriation Doctrine After *Sears-Compco,* 2 Univ. of San Francisco L.Rev. 292 (1968); *see also, Gai Audio of N. Y., Inc. v. Columbia Broad. Sys., Inc.,* 27 Md.App. 172, 340 A.2d 736, 747 (Md.Spec.Ct.App.1975).

The First Circuit has recently recognized that in light of *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), its broad preemptive reading of *Sears-Compco* was "over-inclusive" and that a state can, consonant with the Supremacy Clause, supplement the federal copyright laws.[6] *DeCosta II, supra,* 520 F.2d at 510. *Goldstein* has thus breathed a spark of life into the *INS* misappropriation doctrine. *Melody Record., supra,* 341 A.2d at 354; *Gai Audio, supra,* 340 A.2d at 746; *Mercury Record Productions, Inc. v. Economic Consultants, Inc.,* 64 Wis.2d 163, 218 N.W.2d 705, 712 (1974).

*Goldstein* presented the narrow issue of whether a California statute "making it a criminal offense to 'pirate' recordings produced by others" constitutionally conflicted with the Supremacy Clause and the federal copyright laws. *Id.,* 412 U.S. at 548, 93 S.Ct. at 2305. The Court, in finding that there was no constitutional conflict, limited the *Sears-Compco* preemptive doctrine to the patent field and found that:

> [t]he clause of the Constitution granting to Congress the power to issue copyrights does not provide that such power shall vest exclusively in the Federal Government. Nor does the Constitution expressly provide that such power shall not be exercised by the States. *Id.* at 553, 93 S.Ct. at 2308.

Accordingly, the Court went on to hold that because some writings are

> of purely local importance and not worthy of national attention or protection, we cannot discern such an unyielding national interest as to require an inference that state power to grant copyrights has been relinquished to exclusive federal control. *Id.* at 558, 93 S.Ct. at 2310.

*Goldstein* raises two questions in the context of this case: (1) can a state protect, through its common law, commercial pirating and, if it can, (2) does this protection extend to advertisements which were entitled to federal copyright protection, but whose authors did not obtain it.

While *Goldstein* involved the criminal enforcement of a statutory provision of the California penal code, courts and commentators have not interpreted *Goldstein* to mean that the state may extend copyright protection only by legislative enactment. *See, Melody Record., supra,* 341 A.2d at 351 and the cases and commentaries cited therein. It is, therefore, argued that a state's common law can be extended to provide copyright protection in a federal void. I agree.

■ The import of *Goldstein* is that a state has a viable interest in protecting writings which are of "local importance" provided that this protection does not interfere with and extend into the federal domain. Whether this protection is afforded by statute or judicially developed common law makes no difference; the federal interests, triggering preemption, arise only when the state attempts to regulate the distribution of a writing thought to be in "the national interest." *Id.,* 412 U.S. at 559, 93 S.Ct. 2303.

■ The next question is more difficult. At first blush, it would appear that these advertisements, which are local in nature, are of no national inter-

---

**6.** For an interesting attempt to avoid the *Sears-Compco* rule, prior to *Goldstein, see, Pet Needs, Inc. v. T. F. H. Publications, Inc.,* 156 U.S.P.Q. 479 (N.Y.Super.Ct.1967), where the court held that a book's cover was part of its "distinctive dress" and that the *Sears'* doctrine did not preempt an action for unlawful competition. *Id.* at 480. I cannot subscribe to this expansive reading of "distinctive dress."

est and their misappropriation can be regulated by the state. Even though the ads are local in nature, they are distributed in both Massachusetts and New Hampshire and they are flowing in the stream of interstate commerce. But the test of "national interest" is not whether the writing concerns local matters, but whether the writing is copyrightable under federal law. If the writing is copyrightable, then it is, *per se,* of national interest—any other standard would be unmanageable. *Cf. Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

Central to the *Goldstein* opinion was that prior to 1972, recordings were not copyrightable under federal law. Note, Misappropriation: A Retreat from the Federal Patent and Copyright Preemption Doctrine, 43 Fordham L.Rev. 239, 247 (1974). The *Goldstein* Court reasoned that, if Congress stays its hand and does not afford protection to a particular type of writing, state protection of that writing would not "conflict with federal action. . . ." *Id.,* 412 U.S. at 559, 93 S.Ct. 2303. When, however, a writing is copyrightable, "a conflict would develop if a State attempted to protect that which Congress intended to be free from restraint or to free that which Congress had protected." *Id.* at 559, 93 S.Ct. at 2311.[7]

I do not believe that *Goldstein* can be read to allow the states, under the aegis of their common law, to exercise control over "writings" which are copyrightable. *Nimmer, supra,* vol. 1 § 1.2 at 6, 6.1 and 6.4 & n.7.37. *Rosette v. Rainbo Record Manufacturing Corporation,* 354 F.Supp. 1183, 1192–1193 (S.D.N.Y.1973); *cf. Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d

315 (1974), where the Court stated: "that which is in the public domain cannot be removed therefrom by action of the States."

■ I find that the advertisements were copyrightable "writings" and that the *Sears-Compco* decisions, even as refined by *Goldstein,* preempts a state action for unlawful competition.

## UNFAIR COMPETITION; THE SIMILARITY OF THE BOOKLETS' COVER DESIGN

■ Both parties have stipulated that their booklets are bought on impulse rather than after long and thoughtful deliberation. In order to avail themselves of this "impulse-buying," the parties attempt to display their booklets near the cash register where an additional forty-five cents does not, these days, mean very much. The cover design is, therefore, a very important element for this is all the customer sees before he buys the product. There is no evidence that buyers examine the inside of the booklet before they make their purchase. It is necessary, therefore, to describe and compare the outward appearances of the two publications.

The most salient feature of plaintiff's booklet is that its overall cover design changes with each publication. The only constant features in that design is the publication's name, "The New Hampshire Classified Guide," and that the word "Classified" appears in a rectangular box at the top of the cover. The basic design format has the booklet's name in the top one-third of the page and the bottom two-thirds is used for a variety of designs. Consequently, the design, description, and color arrange-

---

**7.** Callmann argues that "[o]ne's sense of justice should be shocked by the discovery that a rival who boldly usurps the labor and skill of his competitor does not run afoul of the law if his victim failed to obtain the aid of a copyright," and that an action for unfair competition should be allowed. Callmann, Unfair Competition, Trademarks and Monopolies, vol. 1 § 17.2(d) at 590 (1967).

But even Callmann recognizes that his theory—that unfair competition should develop to condemn "the appropriation of literary and artistic values on simple principles of fairness and insisting on standards of decency in competition with or without benefit of copyright," —has not been followed by the Supreme Court. *Id.* at 593 & 594.

**1154**

ment changes weekly. Some issues have a sample list of six ads on the cover; other issues have only the table of contents appearing on the cover; another issue has both sample ads and the table of contents printed on the cover; and, finally, some issues have neither ads nor the table of contents printed on the cover, but, in their stead, a drawing of an idyllic New Hampshire country scene.

Defendant's publication is the same size as plaintiff's and it has adopted the same design format. It makes use of a bleedover border, uses the top third of its booklet for its name, and the bottom two-thirds for various design features. There is, however, more consistency in defendant's cover design; he always makes use of a bleedover border and in the lower two-thirds has either a picture or sample ads.

A close examination of these booklets leads to the conclusion that they are similar, but not identical. Whether this similarity is so close as to make defendant liable is a matter to which I now turn.

Plaintiff does not allege that defendant has infringed his common law trademark nor could such a claim be supported by the evidence. The question is whether defendant has violated New Hampshire law by publishing a booklet whose cover design is so similar to the one published by plaintiff as to constitute unfair competition.

There is very little New Hampshire case law in the field of unfair competition. *Hygienic Products Co. v. Judson Dunaway Corporation,* 81 F.Supp. 935, 945 (D.N.H.1948), *aff'd in part* and *rev'd in part,* 178 F.2d 461 (1st Cir. 1949), *cert. denied,* 339 U.S. 948, 70 S.Ct. 802, 94 L.Ed. 1362 (1949); *Moxie Co. v. Daoust,* 197 F. 678 (D.N.H.1913), *aff'd sub nom.,* 206 F. 437 (1st Cir. 1913). In the field of trademark or trade name infringement, there is also a paucity of controlling New Hampshire authority. *President & Trust. of Colby Col. v. Colby College-N. H.,* 374 F.Supp. 1141 (D.N.H.1974), *rev'd,* 508 F.2d 804 (1st Cir. 1975); *Western Auto Supply Co. v. Western Auto Supply*

*Co.,* 13 F.Supp. 525 (D.N.H.1936); *A. F. Pike Manuf'g Co. v. Cleveland Stone Co.,* 1 Cir., 35 F. 896 (1888); *Blastos v. Humphrey,* 112 N.H. 352, 296 A.2d 918 (1972); *Bogosian v. Fine,* 99 N.H. 340, 111 A.2d 190 (1955); *Nardini's Restaurant, Inc. v. Sterling Co.,* 93 N.H. 364, 42 A.2d 325 (1945).

In the trademark field, a newcomer has the affirmative duty to "name and package his product or service as to avoid all likelihood of consumers confusing it with the product or service of the first comer." *National Automobile Club v. National Auto Club, Inc.,* 365 F.Supp. 879, 882 (S.D.N.Y.1973), *aff'd,* 502 F.2d 1162 (2d Cir. 1974). The Supreme Court has stated that the law of trademarks is but a part of the broader law of unfair competition. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713 (1916). I see no compelling reason to limit this affirmative duty to the trademark field.

But there is a fine line between commercial pirating and commercial parroting, and I take judicial notice that a successful commercial enterprise breeds imitators who attempt to jump on the "money making bandwagon." In fact, the federal policy of copyright protection favors competition in the belief that the competitive struggle stimulates innovative thinking and spirit. Competition is part and parcel of the American way of life and the doctrine of unfair competition should not be used as a means of eliminating or stifling commercial competition. But larcenous conduct should not be mistaken for competition and, if a person engages in conduct which causes a fraud to be perpetrated against the buying public, then he should be subject to state law. *See,* Note, The "Copying-Misappropriation" Distinction: A False Step in the Development of the *Sears-Compco* Preemption Doctrine, 71 Col.L. Rev. 1444, 1455–1457 (1971).

The essential question is, therefore, whether defendant's actions have deceived the public. *DeCosta II, supra,* 520 F.2d at 513.

There is only a scintilla of evidence that defendant's cover design has deceived the buying public. The only evidence introduced to support a claim of public deception was that three advertisers submitted defendant's ad forms to the plaintiff. (Pl's.Ex. No. 22.) On the basis of this evidence, plaintiff attempts to establish that the buying public was deceived as to the source of defendant's publication. This conclusion, however, would be highly speculative for the evidence can cut both ways. It is just as reasonable to infer that the advertisers were fully aware that the two publications were different and that they desired to publish their ads in plaintiff's publication rather than defendant's, and they only used defendant's ad forms because they had previously bought his publication. In fact, defendant's ad forms have his address printed on them, and yet the advertisers chose to ignore the instructions and, instead, sent their ad to plaintiff. This evidence, standing alone, is insufficient to support a claim of public deception.

Moreover, there has been no evidence that plaintiff's cover design has acquired a "special significance" in the buying public. Restatement of Torts § 741 (1938). As stated previously, "Guide" has constantly changed the design features of its cover so that the only constant dominant feature is its name; the names of plaintiff's and defendant's publications are not essentially the same. From an examination of plaintiff's numerous issues, it is clear that he has failed to develop "any unique style or pattern of advertising peculiarly its own . . . ." *Judson, supra,* 178 F.2d at 466. The *Judson* Court recognized that:

> [i]t may be that a merchant or manufacturer can, over a long period of time, make such a distinctive and original arrangement of advertising features common to all, that a competitor

who colorably imitates his distinctive style, format and juxtaposition of elements, will be guilty of unfair competition. *Id.* at 466.

In the instant case, plaintiff has failed to establish that his commercial design is indelibly imprinted on the public's mind.

Courts are confused as to whether a product must have acquired a "secondary meaning" as a prerequisite to a claim for unfair competition. *Compare, National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 747 (S.D.N.Y.), *aff'd,* 497 F.2d 1343 (2d Cir. 1974), *with American-Marietta Company v. Krigsman,* 275 F.2d 287, 289 (2d Cir. 1960).

In *Judson,* when discussing the claim for unfair competition, the court implied that a "secondary meaning" was an essential part of plaintiff's proof. This view is supported by the Restatement which requires that, in order to sustain a claim for unfair competition, the imitated design or feature must have "acquired generally in the market a special significance identifying the other's goods, . . . ." Restatement of Torts § 741 (1938). *See also, Kyhos v. Perpetual Savings and Loan Association,* 480 F.2d 204, 208–209 (4th Cir. 1973).

In trademark cases, the New Hampshire Supreme Court has favorably cited the Restatement and I assume that they would follow its provisions in a suit for unfair competition.

Based on all the evidence, I find that plaintiff has failed to establish that his publication and cover design have acquired a "special significance" in the buying public or that defendant's publication is so similar that it has deceived the public.

For the foregoing reasons, I find for the defendant. Judgment accordingly. No costs.

So ordered.